BRIDGETTE BELTON,

                Plaintiff,

-vs-                                                **Case No. 6:08-CV-1544-ORL-31KRS**

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

                Defendant.
_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Bridgette Belton, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 10, 11.

## I. PROCEDURAL HISTORY.

In March 2001, Belton applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes collectively referred to herein as the Act). R. 72-74, 165-67. The applications alleged that Belton became disabled on January 1,

2000.  R. 72, 165.  Belton's applications were denied initially, on reconsideration, by an

administrative law judge (ALJ), and by the Appeals Council.  R. 5-6, 12-17, 61-62, 65-67,

171-72.  On appeal, this Court affirmed the decision of the Commissioner.  R. 329-53.

Thereafter, Belton filed new applications for OASDI and SSI benefits alleging that

she became disabled on July 17, 2002.  R. 247, 279-81.[1]  These applications were again

denied initially and on reconsideration.  R. 257, 259, 265-70.  Belton requested a hearing

before an ALJ.  R. 264.  An ALJ held a hearing on November 19, 2004.  Belton,

represented by an attorney, testified at the hearing.  Darrell L. Belton, Belton's husband,

and Donna Mancini, a vocational expert (VE), also testified.  R. 626-48.

After considering the testimony and the medical evidence presented, the ALJ

determined that Belton was insured under OASDI through the date of the decision, April

4, 2005.  R. 248, 254.  The ALJ found that Belton had not engaged in substantial gainful

activity since the alleged onset date of her disability.  R. 254.

The ALJ concluded that the medical evidence showed that Belton had a seizure

disorder, which was a severe impairment.[2]  This impairment did not meet or equal any of

---

[1] The Commissioner states that the new application for SSI benefits, accompanying notices and protective filing date were not available for inclusion in the record.  Doc. No. 14 at 2 n.1.  Belton does not object to the failure to include these documents in the administrative record.

[2] Curiously, the Commissioner argues in his memorandum that there was no credible evidence of a seizure disorder.  Doc. No. 14 at 14. The ALJ's finding at step two of the sequential evaluation is not at issue.

the impairments listed in the applicable social security regulations (the Listings).[3]  R. 251,

254.  The ALJ considered a mental functional capacity assessment prepared by a nurse

practitioner, but gave it little weight because it was based on Belton's self-reports and not

supported by the medical evidence before the ALJ.  R. 252.  Accordingly, the ALJ found

that Belton had "no mental disorders."  *Id.*

The ALJ found that Belton had the residual functional capacity (RFC) to perform a

substantial range of light work, specifically as follows:

> she can lift/carry 20 pounds occasionally, 10 pounds or less, frequently; she
> can sit for up to 6 hours and stand/walk for up to 6 hours, with normal
> breaks, in an 8 hour work day; she can climb stairs and ramps, but due to
> her seizure disorder she cannot climb ropes, ladders or scaffolds; she can
> balance, stoop, kneel, crouch or crawl; she can perform push/pull functions
> with her upper and lower extremities; she should avoid hazards, such as
> unprotected heights and moving machinery; she is otherwise without
> limitation.

R. 251-52.

In reaching this conclusion, the ALJ found that Belton's testimony was generally

not credible because the medical evidence suggests that Belton was not compliant with

her medication.  R. 252.  The ALJ also found that Belton had not carried her burden of

proof that she could not work as a result of her seizure disorder, noting that Dr.

Eisenschenk reported that Belton's seizures occured mostly during evening hours.  *Id.*

---

[3]  The Code of Federal Regulations "contains a Listing of Impairments specifying
almost every sort of medical problem ('impairment') from which a person can suffer,
sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d
1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

Belton had past relevant work as a housekeeping maid.  The ALJ purported to rely on the testimony of the VE that Belton could return to that past relevant work.  R. 253.[4]

In an abundance of caution, the ALJ continued the sequential evaluation through step five.  R. 253-54.  Based on the Medical-Vocational guidelines (Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Belton could perform work that was available in the national economy.  R. 253-55.

Belton requested review of the ALJ's decision. R. 239-43.  On July 13, 2005, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 236-38.  Belton sought review of this decision by this Court after the Appeals Council granted her an extension of time to file a civil action due to the failure of her previous attorney to timely file the complaint.  *See* R. 217-21.

## II.  JURISDICTION.

Belton having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.  STATEMENT OF FACTS.

The essential facts of record are set forth in the ALJ's decision and the parties' memoranda.   Additionally, the facts of record as of the time the Court reviewed the denial of Belton's initial applications are set forth in the Court's order, R. 329-53, which facts I adopt by reference herein.  Accordingly, I will only summarize the pertinent facts to protect Belton's privacy to the extent possible.

---

[4] The transcript of the VE's testimony is substantially incomplete due to inaudible sections.  *See* R. 646-47.

Belton was born in 1965.  R. 279.  She graduated from high school.  R. 31, 646.

She previously worked in housekeeping.  R. 32-33, 298.  These jobs required her to

vacuum, sweep and mop floors, dust, take out trash and clean bathrooms and kitchens.

She walked up to 8 ½ hours, stood up to 15 hours, sat 30 minutes to 3 hours, stooped up

to 8 hours, and handled, grabbed or grasped big objects up to 8 ½ hours.  She lifted less

than 10 pounds.  R. 33, 47-48, 299-302.

Belton reported having seizures since childhood, but they had been in remission

from 1991 through December 2000.  R. 158.  Reginald Q. Bowden, M.D., opined based

on the information Belton provided to him that she had a seizure disorder, and he

ordered an EEG and CT scan of the brain.  R. 158-59.    Both the EEG and CT scan

results were unremarkable.  R. 136-37, 156.

On April 12, 2001, Belton again reported having seizures.  Dr. Bowden prescribed

Dilantin.  R. 156.  On June 8, 2001, her Dilantin level was sub-therapeutic.  She told Dr.

Bowden that she occasionally missed her doses of Dilantin and never took it more than

twice a day.  R. 155.

Belton sought emergency room treatment on August 8, 2001, due to a reported

tonic-clonic seizure at home.  R. 398.  Her Dilantin level was less than 4 and, thus, not

therapeutic.  Gary Morrison, M.D., wrote that Belton "insists she is not missing any of her

Dilantin.  This is a bit difficult to believe . . . ."  R. 399.  He prescribed Dilantin.  *Id.*

At a follow-up visit with Dr. Bowden on November 21, 2001, Belton reported no

seizure activity despite the fact that she had been out of medication since the first of the

month.  R. 146.  Dr. Bowden warned Belton that, due to five missed appointments, she

would be discharged from his practice if she missed further appointments in the next

year.  R. 147.

On January 24, 2002, Belton complained of headaches because she had been out of Dilantin for four days.  R. 163.  Dr. Bowden opined that the headaches might be "related to possible subclinical seizures," and he restarted her Dilantin.  *Id.*

During the original hearing before an ALJ in May 2002, Belton testified that Dr. Bowden told her that if her chest hurt, she was having a slight seizure.  She had this type of slight seizure every other day.  R. 35-36, 51-52.  At that time, Belton testified that she was taking only phenobarbital, but she produced a medication bottle for Dilantin.  R. 36, 48.  Her last major seizure was the previous August.  R. 50.  The medication made her drowsy.  R. 39.  She slept most of the day.  R. 39-40.

Belton sought treatment at Halifax Medical Center emergency room on September 12, 2002, for a reported grand mal seizure.  Belton indicated that she had been out of Dilantin for seven months, and that she had "not had a seizure in awhile."  R. 184.  Examination revealed that Belton bit her lip.  R. 185.  A CAT scan of the brain was normal, and her Dilantin levels were therapeutic.  R. 412.  She was treated with Dilantin and discharged.  R. 185.

The next day, Sherman Ibarra, M.D., examined Belton.  Contrary to her reports to the hospital staff, Belton told Dr. Ibarra that she had about two seizures per month and that she had been out of Dilantin for only two weeks.  R. 180.  Dr. Ibarra continued her on Dilantin.  R. 181.

Belton again sought emergency room treatment on September 23, 2002 due to chest pain that she usually associated with a seizure.  Her husband reported the Belton had a seizure in the car that lasted approximately five minutes, and did not involve biting

her tongue or incontinence.  Upon examination, she was awake, alert and oriented.  R. 187.  Her Dilantin level was elevated at 27.4.  Omar Adams, M.D., opined that Belton had a seizure disorder that was poorly controlled.  She was discharged on September 24, 2002.  R. 189.

Belton returned to the emergency room on September 25, 2002, complaining of a seizure that morning with incontinence, and a second seizure in the emergency room without incontinence.  She reported that she was not taking Dilantin, R. 193, but her Dilantin level was 31.1, R. 194.[5]  Luther St. James, III, M.D., opined that Belton had an acute exacerbation of a seizure disorder with Dilantin toxicity.  He recommended monitoring her Dilantin on a daily basis.  R. 196.  An EEG and an MRI taken while Belton was hospitalized were normal. R. 414, 418.  She did not have additional seizures while in the hospital.  R. 406.  However, she did have "a peculiar episode of shaking, which certainly did not look like a real seizure" to John Prairie, M.D.  R. 413.  At the time of this incident, Belton's Dilantin level was elevated at 31.1.  *Id.*  Dr. St. James discharged Belton once her Dilantin levels were normal.  R. 406.

Jennifer Salansky, M.D., examined Belton on October 4, 2002.  Belton reported that she had not had a seizure since being discharged from the hospital.  R. 177.  Dr. Salansky examined Belton again on November 5, 2002. She reported a seizure three or four days earlier in which her eyes rolled back into her head with incontinence.  She reported being confused for a few minutes thereafter, continued "shakes" in her upper extremities, and headaches. Dr. Salansky referred Belton to a neurologist.  R. 215-16. A

---

[5]  The treatment record reflects that Belton was given one-half of a 100 mg Dilantin tablet on admission to the hospital.  R. 193.

laboratory test confirmed that Belton's Dilantin was at a therapeutic level of 12.8.  R. 211.

On December 5, 2002, Belton told Dr. Salansky that she next had a seizure on November 27, 2002 with loss of consciousness lasting approximately ten minutes and incontinence, but no tongue biting.  She continued to experience headaches.  Laboratory reports showed that her Dilantin level was sub-therapeutic at 2.5 even though Belton reported taking Dilantin daily.  R. 210-11.

Also on December 5, 2002, a physician whose name is illegible completed an RFC assessment after review of Belton's records.  The physician opined that Belton should never climb or balance due to the seizure disorder, should never work around hazards and should avoid exposure to certain environmental conditions.  R. 441-48.  The physician wrote that Belton was "non-compliant w[ith] prescribed treatment.  Effects of symptoms or level of functioning is inconsistent w[ith] total medical evidence."  R. 446.

Jacob Green, M.D., Ph.D., a neurologist, examined Belton on December 9, 2002.  At that time, she reported having twenty seizures a month.  R. 200.  Dr. Green ordered an MRI angiogram, which did not reveal any aneurysm.  R. 202, 569. Dr. Green wrote that though Belton was a compliant patient, "a regimen of medication to be stuck to regularly . . . would definitely create a better chance of not having any seizures."  R. 202, 525.

On February 7, 2003, Nicholas H. Bancks, M.D., prepared an RFC assessment after review of Belton's records.  Dr. Bancks opined that Belton should never climb ladder, ropes or scaffolds, and could only occasionally balance.  She should avoid concentrated exposure to hazards.  R. 480-87.

Belton returned to Dr. Salansky on March 5, 2003.  She reported having four to

five seizures a day with urinary incontinence and headaches. R. 568. Although Belton said that she took medication as prescribed, Dr. Salansky noted that her Dilantin level was low. Dr. Salansky referred Belton to a psychiatrist to determine whether the seizures might be pseudoseizures.[6] R. 569.

Doris Jones, a psychiatric nurse practitioner (ARNP), examined Belton on April 22, 2003. R. 590-94. At that time, Belton reported having three to four seizures each week. R. 590. Her assessment was that Belton had a generalized anxiety disorder (GAD), major depressive disorder (MDD), recurrent and moderate, with a global assessment of functioning score of 50 currently and 70 in the past year. She prescribed Zoloft and Resperdal. R. 594. Jones continued to monitor Belton's condition and medication through at least September 2004. R. 581-89, 612-13. She could not identify an etiology for Belton's reports of seizures. R. 613.

Belton sought treatment at an emergency room on June 10, 2003 due to a seizure. She reported that she had been vomiting and unable to take her medication. By the time she was seen by Richard Mohammed, M.D., she was asymptomatic and had no problems. R. 503. Her Dilantin level was sub-therapeutic at 2.5. R. 504. Peter Springer, M.D., the emergency room physician, noted that it was questionable whether Belton was being compliant with her medication. R. 511.

James A. Scott, M.D., increased her Dilantin and Neurotin and ordered an EEG. He directed that Belton not drive until she was seizure free for at least six months. R. 506. Dr. Scott opined that Belton's psychiatric condition appeared relatively stable. R.

---

[6] "An attack resembling an epileptic seizure, but having purely psychological causes and sometimes able to be stopped by an act of will." Doc. No. 14 at 4 n.2 (citing *Dorland's Pocket Medical Dictionary*, 693 (26th ed. 2001)).

507.

Belton was admitted to the hospital on July 29, 2003, after complaining of suffering four seizures that day. She had no tongue laceration or incontinence. Her Dilantin level was 29. R. 372-73. Dr. Scott's impression was recurrent seizures with pseudoseizures also in the differential. R. 371. It appears that Dr. Scott later discharged Belton as a patient because she was not compliant with her medication. R. 552.

On August 10, 2003, Belton again sought emergency room treatment for seizures. She reported having a seizure that made it difficult for her to talk. Howard Rodenberg, M.D., described Belton's speech as robotic. Belton reported that she had not run out of medicine or missed any doses. R. 498. Her Dilantin level was markedly elevated at 43.4. She was admitted to the hospital due to Dilantin toxicity and discharged on August 14, 2003, with instructions not to take Dilantin until seen by her doctor. R. 493, 499.

Rachel Eyma, M.D., examined Belton on August 18, 2003. She reported having a seizure the previous evening, and she indicated that she had about four to five seizures each week. R. 562. Dr. Eyma restarted Belton on Dilantin. R. 564.

Belton returned to the emergency room on August 30, 2003, stating that she had had three seizures the previous evening and possibly another seizure that day. R. 489. A physical examination was normal. Her Dilantin level was 3.8, which Dr. Rodenberg opined was either sub-therapeutic or the result of problems with compliance. R. 490.

Belton returned to Dr. Eyma on September 15, 2003. She reported having seizures only at night, sometimes two days in a row and then seizure-free for three days. R. 559. Her Dilantin was in a therapeutic range. R. 560.

On October 2, 2003, Belton sought emergency room treatment due to a headache

following a seizure. Her Dilantin level was 4.8. Kevin MacMahon, M.D., prescribed Dilantin. R. 367.

Dr. Eyma examined Belton again on October 20, 2003. R. 551. Dr. Eyma had spoken to Dr. Scott, who stated that Belton had not been compliant with her medication and might be having pseudoseizures, not regular seizures. Dr. Eyma referred Belton to Shands hospital. R. 552. Belton continued to seek treatment from Dr. Eyma. *See, e.g.,* R. 543-46.

Dr. Green examined Belton on November 6 and December 29, 2003. R. 512, 522. He ordered an MRI of the brain, which was unremarkable. R. 514. On December 29, Belton was "out of sorts" because she believed Dr. Green had indicated that she could work. Dr. Green wrote in his notes that he had never done a functional capacity evaluation (FCE) "but clearly with a history of seizures which she states the last one as 12/28/2003 she cannot drive and cannot work." R. 512. Dr. Green's assessment was seizure disorder by history and psychosis. R. 512.

Dr. Eyma hospitalized Belton for observation from March 18 through March 22, 2004. R. 358-65. An EEG was within normal limits. She had "episodes of jerking of her head and then banged her head on the side [rails]" during the examination, but no epileptiform abnormality was noted. R. 364. A brain CT scan was also unremarkable. R. 365. David J. McDonald, M.D., examined Belton and recommended a change of medication to Tegretol. R. 363. Bhawesh N. Patel, M.D., wrote in the discharge summary that "patient probably had a compensation neurosis rather than a true seizure disorder." R. 358.

Belton returned to Dr. Eyma on May 4, 2004. Dr. Eyma advised Belton not to

drive or go out alone due to her reports of frequent seizures.  R. 596.

Belton was examined by Stephan Eisenschenk, M.D., at Shands Healthcare on May 20, 2004.  She reported that the seizures occurred up to three times a day, typically in the daytime but recently also at night.  R. 601.  She also reported feeling shaky before a seizure.  R. 602.  Her physical examination was normal.  R. 602-03.  Dr. Eisenschenk opined that Belton's history was consistent with possible refractory epilepsy, but that she might also have a seizure disorder with migraines and pseudoseizures.  Accordingly, he admitted Belton for 24-hour EEG monitoring.  Dr. Eisenschenk noted that Belton was potentially disabled by her recurrent seizures and the medications she took which caused cognitive slowing.  R. 603.

The EEG monitoring was conducted beginning on June 28, 2004.  The test showed that her condition was nonepileptic in nature.  R. 605, 620.  Dr. Eisenschenk noted, however, that there was some evidence that Belton might have complex partial seizures on top of her nonepileptiform events, but such seizures had not yet been captured.  Because the seizures happened primarily at night, Dr. Eisenschenk noted that they were likely real seizures not pseudoseizures.  He recommended another course of 24-hour EEG monitoring, which was to be scheduled for January 2005.  R. 620-21.  Belton did not submit results of this additional monitoring in support of her request for review of the ALJ's decision by the Appeals Council.

Belton returned to Dr. Eyma on September 24, 2004.  Belton advised that she had been diagnosed with pseudoseizures at Shands, and that her medication had been modified.  R. 614.

On December 12, 2004, ARNP Jones prepared a mental RFC assessment.  She

opined that Belton was moderately limited in the following abilities: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them / make simple work-related decisions; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and in all areas of social interaction. She opined that Belton was markedly limited in the following abilities: perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others. R. 622-23. In support of her assessment, Jones wrote that Belton had an inappropriate affect, reported violent seizures (confirmed by her spouse), and relied on her husband and children for assistance with household chores. Jones opined that "[s]afety requires she be in the presence of another adult for the greater part of her waking hours, as well as night time." R. 624.[7]

At the ALJ's hearing, Belton's husband testified that Belton had two or three seizures a day lasting thirty to forty-five minutes each, sometimes accompanied by staring, shaking, falling and incontinence. R. 630-31. He carried Belton's medicine to ensure that she took it as prescribed, but it was not effective. R. 633.

Belton testified that she had had a seizure the day before the hearing for which

---

[7] The end of the report has an illegible signature of someone who reviewed the report. R. 624.

she sought emergency room treatment.  R. 637.  She believed that stress triggered the seizures.  R. 640.  She averred that she had had three or four seizures a day for almost a year, always with urinary incontinence.  R. 643, 645.  During the day, she stayed in the room in her house where her Medical Alert alarm was located.  R. 645.  She did not like to be around other people for fear of having a seizure in their presence.  *Id.*

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

(3) Does the claimant's impairment meet or equal one of the

specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4); 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.    ANALYSIS.

Belton asserts three grounds supporting reversal. First, she contends that the ALJ erred by failing to state the weight given to the opinion of Dr. Green, failing to state what part of Dr. Eisenschenk's opinion was given "greater weight," and because the evidence

in the record did not support his decision to give little weight to ARNP Jones's mental RFC assessment.  Second, she submits that, based on her and her husband's reports of her seizures, her condition meets or equals Listing 11.02.  Third, she argues that the ALJ erred in finding that her testimony was not completely credible.  These are the only issues I will address.[8]

A.      *Weight to Opinions of Treating Professionals.*

An ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir.1981). With respect to treating physicians, the ALJ must give substantial or considerable weight to their opinions unless good cause is shown to the contrary. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory.  *Id.* (internal citations omitted). "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

**1.      Dr. Green**.

Belton argues that the ALJ erred by failing to consider the opinion of Dr. Green, a treating neurologist.  Dr. Green opined in December 2002 that while Belton was a compliant patient, sticking to a regimen of medication would create a better chance that she would not have seizures.  R. 202, 525.  In December 2003, he indicated that, while

---

[8]      The parties were advised that issues not specifically raised would be waived.  Doc. No. 12 at 2.

he had not done a functional capacity evaluation (FCE), "clearly with a history of seizures which she states the last one was 12/28/2003 she cannot drive and she cannot work." R. 512. He further clarified, "She is in my opinion disabled and cannot work because she cannot drive to work. No FCE was done." R. 512.

Belton is correct that the ALJ did not refer to Dr. Green by name or to his treatment notes by exhibit number in his decision. The Commissioner argues, essentially, that the error was harmless because Dr. Green's opinion that Belton was disabled is a matter reserved to the Commissioner, and his conclusion was based only on Belton's self-report of her condition which is not supported by the medical evidence.

While the Commissioner's argument is a fair one, as I read the law in this circuit, the review by this Court must focus on the reasons the ALJ gave for not giving great weight to the opinion of a physician, not an after-the-fact justification presented by the Commissioner. *See, e.g., Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam) ("In assessing the medical evidence in this case, the ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons therefor.") (citation omitted). Accordingly, the ALJ was obligated to state the weight he accorded Dr. Green's opinion. Absent this information from the ALJ, the record is insufficient to permit meaningful review. *See Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984).

**2.    Dr. Eisenschenk.**

Belton argues that the ALJ did not state good cause for rejecting the opinion of Dr. Eisenschenk that she was potentially disabled due to a "definitive diagnosis . . . that [she] had 'Intractable seizures with superimposed nonepileptiform events.'" Doc. No. 13 at 20.

As an initial matter, Belton overstates Dr. Eisenschenk's opinion. He stated that his impression in September 2004, was that Belton had intractable seizures with superimposed nonepileptiform events, but he ordered additional testing before reaching a final diagnosis. R. 620-21. The records of the additional testing and Dr. Eisenschenk's ultimate conclusion are not before the Court.

The ALJ's analysis of Dr. Eisenschenk's opinion is as follows:

> No examining or treating physician opined that she was unable to work. . . . In May 2004, Dr. Eisens[c]henk went so far as to say he believed she was 'potentially' disabled by her recurrent seizures and medication which caused cognitive slowing. However, he also reported that claimant's seizures occurred mostly during the evening hours, which, if she were to be compliant with her medication would permit her to work during the day.

R. 252. The ALJ further stated that he gave "greater weight" to Dr. Eisenschenk's opinion than the opinions of the reviewing physicians. *Id.*

Belton argues that the ALJ misread Dr. Eisenschenk's report, because he indicated that her seizures occurred in the daytime. In his May 20, 2004, report, Dr. Eisenschenk wrote as follows: "Typically they occur during the daytime but more recently they may also occur out of sleep." R. 601. In his September 20, 2004 report, however, he indicated that Belton told him that her seizures happen "primarily at nighttime . . . ." R. 620.

Belton correctly argues, however, that the ALJ did not explain what part of Dr. Eisenschenk's opinion he afforded "greater weight." Specifically, the ALJ did not address why he did not credit Dr. Eisenschenk's opinion that Belton's medication caused "cognitive slowing." This finding is consistent with Belton's testimony that medication made her drowsy. The Eleventh Circuit has held that an ALJ must make a finding about

functional limitations arising from side effects of medication when such side effects are presented in the record. Failure to do so is reversible error. *See Cowart,* 662 F.2d at 737; *McDevitt v. Comm'r*, 241 F. App'x 615, 619 (11th Cir. 2007) (per curiam).[9]

### 3. ARNP Jones.

Belton argues that the ALJ erred in rejecting the mental RFC assessment prepared by ARNP Jones because Belton's report of the seizures she suffered, whether epileptic or pseudoseizures, was consistent with Dr. Eisenschenk's diagnosis of intractable seizures with superimposed nonepileptiform events. As noted above, however, Dr. Eisenschenk had not rendered a final diagnosis in the reports before the Court.

Belton also argues that the ALJ erred by finding that only ARNP Jones signed the mental RFC assessment. She contends that it was reviewed by Dr. Raimondo. While it appears that someone reviewed the report, substantial evidence does not indicate that it was reviewed and approved by Dr. Raimondo due to the illegible signature.

In determining what weight to give the mental RFC assessment, the ALJ noted that ARNP Jones reported that Belton denied anxiety, suicidal thoughts, or other psychiatric symptoms. Jones found that Belton's cognition and memory were intact with no psychotic process. Therefore, the ALJ concluded, ARNP Jones's findings did not support the significant limitations set forth in her mental RFC assessment. R. 252. This finding is supported by substantial evidence. Accordingly, the ALJ properly considered the mental RFC assessment by ARNP Jones and stated adequate reasons, supported by

---

[9] This unpublished opinion is cited for its persuasive authority. *See* 11th Cir. R. 36-2 and I.O.P. 6.

the record, for giving it limited evidentiary weight.[10]

B.    *Credibility and Listing 11.02.*

Belton contends that based on her and her husband's testimony about the seizures she experiences, the evidence establishes that her condition meets or equals Listing 11.02.  She further submits that the ALJ erred in finding her testimony about the seizures and functional limitations thereof was not fully credible.  There is no argument that medical evidence in the record provides objective evidence sufficient to meet or equal Listing 11.02 if the ALJ's credibility decision is upheld.

In this circuit, if an ALJ decides not to credit a claimant's testimony about pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so.  *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).  Here, the ALJ based his credibility determination on medical evidence that "strongly suggests the claimant was not compliant with her medications."  R. 252.  Substantial evidence supports that conclusion.  As outlined above, Belton admitted on several occasions to being out of medication or not using medication as prescribed.  Blood tests further confirmed the inconsistent use of medication, showing at times that she had excessive amounts of Dilantin and other times that she had sub-therapeutic amounts. Additionally, there is record evidence of missed appointments, and at least one physician discharged Belton as a patient due to non-compliance. Accordingly, the ALJ articulated explicit and adequate reasons, supported by evidence in the record, for finding that Belton's testimony was not generally credible.

_____

[10]  It would be prudent on remand for the Commissioner to obtain a consultative psychiatric or psychological examination to evaluate Belton's mental RFC.

Listing 11.02 requires a documented showing of seizures occurring more frequently than once a month with daytime episodes involving loss of consciousness and convulsions or nighttime episodes manifesting residuals which interfere significantly with activity during the day. Other than Belton's self-reports, this level of seizure activity is not demonstrated in the medical records. Therefore, based on the ALJ's credibility finding, there is insufficient evidence in the record to show that Belton's condition met or equaled Listing 11.02.

   C.    *Remand for Further Proceedings or An Award of Benefits.*

Because the ALJ did not state the weight given to the opinion of Dr. Green and did not properly assess Dr. Eisenschenk's opinion regarding the side effects of medication or explain what part of his decision was given "greater weight," remand is required. Belton submits that the Court should remand the case for an award of benefits.

The Court may order an award of benefits only "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (citing *Bowen v. Heckler*, 748 F.2d 629, 635-36 (11th Cir. 1984)); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Because the Commissioner has not yet properly evaluated the evidence, and the record is incomplete because most of the VE's testimony is inaudible, it is not clear that Belton is disabled without any doubt. Therefore, remand for an award of benefits is not appropriate.

**VI.    RECOMMENDATION.**

For the reasons stated herein, I respectfully recommend that the decision of the Commissioner be **REVERSED** and that this case be **REMANDED** for the Commissioner

of the Social Security Administration for further proceedings. I further recommend that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within **fourteen days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** this 18th day of December 2009.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE